UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
PETER NG,                           )
                                    )
            Plaintiff,              )
                                    )
        v.                          )   Civil Action No. 11-CV-0673 (KBJ)
                                    )
RAY LAHOOD, SECRETARY,              )
U.S. DEPARTMENT OF                  )
TRANSPORTATION,                     )
                                    )
            Defendant.              )
                                    )
_____ )

MEMORANDUM OPINION & ORDER

Plaintiff Peter Ng filed this action on October 21, 2011, alleging three counts: discrimination based on race (Count I), discrimination based on national origin (Count II), and retaliation (Count III), all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*. Ng's claims stem from actions taken by his employer, the Air Traffic Organization ("ATO"), a division of the Federal Aviation Administration ("FAA"), and, by extension, the Department of Transportation ("DOT"). Before the Court is Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, as well as Ng's motion, pursuant to Fed R. Civ. P. 37, to strike certain declarations included in Defendant's summary judgment briefing. For the reasons set forth below, Ng's Motion to Strike is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

1

I.  BACKGROUND

Ng is an Asian-American male of Chinese national origin.  (Defendant's Statement of Undisputed Material Facts ("D-SOF") ¶ 1 [ECF No. 21].)  Ng has worked for ATO for over thirty years.  (Plaintiff's Statement of Disputed Material Facts ("P-SOF") ¶ 10 [ECF No. 24].)  In 2006, Ng took the position of Technical Support Manager in ATO's Communications Services Unit ("Communications Unit"), and remained in that position at all times relevant to this action.  As a Technical Support Manager, Ng provided technical expertise in support of the Communications Unit's mission to provide timely and relevant information to ATO employees and to communicate ATO programs and objectives to employees, customers, and stakeholders.  (D-SOF ¶ 2.)  Although Ng was based in Boston, he was responsible for supervising employees in Washington, D.C.  (Complaint ("Compl.") ¶¶ 6-7; D-SOF ¶ 3.)[1]

Prior to the fall of 2008, Ng's immediate supervisor was then-Communications Unit Vice President Sandra Sanchez.  (Compl. ¶¶ 8, 9; D-SOF ¶ 6.)  In August of 2008, Gerald Lavey replaced Sanchez and became Ng's immediate supervisor.  (Compl. ¶ 9.)

Ng's allegations of discrimination arise out of the following acts.  The facts are undisputed except where otherwise noted:

Prior to Sanchez's departure in August 2008, she recommended that Ng receive the highest Superior Contribution Increase rating ("SCI") for 2008—called SCI-1.[2]  (Compl. ¶ 10.)

---

[1] The permanent duty station for a Technical Support Manager is at FAA headquarters in Washington, D.C.  (D-SOF ¶ 3.)

[2] The SCI is a bonus (in the form of a higher annual pay raise) available to FAA employees who are recommended for such increase by their supervisor based on their superior performance. Such employees can be recommended for either SCI-1 (which includes an additional 1.8% pay raise) or SCI-2 (which includes an additional 0.6% pay raise).  The recommendation of an

In October of 2008, two months after Lavey succeeded Sanchez to become Ng's supervisor and before Sanchez's SCI recommendation for Ng was approved, Lavey recommended that Ng receive the second-highest rating, SCI-2.  (Compl. ¶ 11.)  Lavey's supervisor, John Pipes, chose instead to credit the prior recommendation that Sanchez had made.  (Compl. ¶ 13.)  As a result, Ng received the highest possible SCI rating for 2008.  (Compl. ¶¶ 10-13.)

At the time Lavey became Ng's supervisor, Lavey had four direct reports:  Ng, Kimberly Pyle, Edward Braese, and Terry Snyder.  (D-SOF ¶¶ 7, 10.)  In October of 2008, Lavey undertook to restructure the Communications Unit by trimming the organizational structure from four groups (each headed by one of Lavey's four direct reports) to two groups.  (D-SOF ¶¶ 10-12.)  As a result of the restructuring, Ng's Technology Information group was subsumed into a newly formed Communications Operations group and Ng began reporting to Braese, one of his former peers, rather than directly to Lavey.  (Plaintiff's Brief in Opposition to Summary Judgment ("Pl. Br.") Ex. B [ECF No. 24-2]; D-SOF ¶ 13.)  Similarly, Pyle's Congressional Communications group was folded into a newly formed Communications Strategy group, and Pyle began reporting to Snyder rather than directly to Lavey.  (D-SOF ¶ 14.)  There was no change "on paper" to the number of people Ng supervised, nor were any changes made to Ng's salary and benefits.  (D-SOF ¶ 13.)  Nevertheless, Ng asserts that the "reality" was different, in that he was "prohibited from" communicating with his subordinates after that point.  (Defendant's Brief in Support of Summary Judgment ("Def. Br.") Ex. A (Deposition of Peter Ng) ("Ng Dep.") [ECF No. 21-1] at 22:6-17.)  Ng also alleges that, after the restructuring, he was excluded from management meetings.  (Compl. ¶¶ 18-19.)

---

employee's supervisor must be approved by a second-level official, generally the employee's second-level supervisor.  (D-SOF ¶ 5.)

In November of 2008, Ng submitted a request to Lavey to attend a training session about administrative investigation. (Def. Br. Ex. 13 [ECF No. 21-2].) Lavey responded to Ng that a "decision [had been] made" that only one member of the Communications Unit staff should attend the training session. (*Id.*) One of Ng's former colleagues, Terry Snyder, a white male and one of two Communications Unit employees who directly reported to Lavey after the restructuring, attended the training. (Compl. ¶¶ 22-25.)

In the course of his duties, Ng created and managed the technical aspects of a pilot communications project known as the "Vortex Project." (P-SOF ¶ 22.) The Vortex Project was a system designed to convey information to ATO employees. (D-SOF ¶ 24.) Ng asserts that certain Communications Unit employees opposed the project and consistently sought to undermine it. (P-SOF ¶ 24.) Ng claims that sometime around the end of 2008 or the beginning of 2009, his role in supervision of this project was significantly reduced. (Compl. ¶¶ 29-30.) Ng alleges that Braese took over many of Ng's duties with respect to the Vortex, including substituting Braese's name for Ng's as a point of contact for the Vortex Project. (Compl. ¶ 30.) Ng also alleges that his name was removed from the project wall, and many of his other Vortex-related tasks were delegated to Richard Roberts, a lower-ranking member of the Communications Unit. (P-SOF ¶ 25.)

In January 2009, Ng was directed to report to ATO headquarters in Washington, D.C., for a 60-day period, to work on the Vortex Project. (Compl. ¶ 31; D-SOF ¶ 27.) Ng contends that he was required to travel to the District of Columbia on the day after the Presidential Inauguration, making it difficult for him to obtain travel and living accommodations. (Compl. ¶ 32.) Ng also claims that, upon arrival, Ng found that all other employees had been instructed to work from home that day. (Compl. ¶ 33.) Additionally, Ng maintains that, when he arrived in

Washington, "there was nothing for [him] to do," causing him to feel "embarrassed when other employees saw him sitting with nothing to do." (P-SOF ¶ 31.) Ng did not spend the entirety of the 60 days in Washington, instead leaving for at least three weeks for various non-Vortex related events. (D-SOF ¶ 32.)

Finally, while not included in the Complaint or in his Statement of Disputed Material Facts, Ng's summary judgment brief includes allegations that employees in the Communications Unit at times made disparaging comments regarding his accent. (Pl. Br. at 20-22.) Specifically, Ng alleges that Pyle made fun of his accent at a staff meeting; that on several occasions Claudia Bogard (another Communications Unit employee) said that she could not understand Ng; and that Braese consistently made snide comments that Ng alleges were racially motivated. (*Id*.) [3]

## II. LEGAL PRINCIPLES

### A. Standard of Review for Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). To establish a genuine issue of material fact, the nonmoving party must demonstrate—through affidavits or other competent evidence (Fed. R. Civ. P. 56(c)(1))—that the quantum of evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson,* 477 U.S. at 248). While the Court views all facts in the light most favorable to the

---

[3] Sandra Sanchez, Lavey's predecessor and Ng's former supervisor, testified that these comments included Braese complaining that Ng was hard to understand. (Pl. Br. Ex. A (Sanchez Deposition) at 134:9-18.) Sanchez also testified that Braese expressed skepticism that Ng had actually done work that was attributed to Ng. (*Id*. at 134:9-18.)

nonmoving party in reaching that determination, *Keyes v. District of Columbia,* 372 F.3d 434, 436 (D.C. Cir. 2004), the nonmoving party must nevertheless provide more than "a scintilla of evidence" in support of its position. *Anderson,* 477 U.S. at 252. Finally, "although summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Adair v. Solis*, 742 F. Supp. 2d 40, 50 (D.D.C. 2010), *aff'd,* 473 Fed. Appx. 1 (D.C. Cir. 2012) (internal quotation marks and citations omitted).

B. <u>Legal Standard for Employment Discrimination and Retaliation</u>

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII "establishes two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (internal quotation marks omitted). To prove a retaliation claim, a plaintiff must establish "(1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially

adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012).[4]

Traditionally, courts have examined Title VII discrimination claims under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). However, the D.C. Circuit has clarified that, "in a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady*, 520 F.3d at 494. Instead, the court must simply determine whether the plaintiff has produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . ." *Id.*

C. Standard for Reviewing Motions to Strike Supporting Affidavits

"The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion." *Canady v. Erbe Elektromedizin GmbH*, 384 F. Supp. 2d 176, 180 (D.D.C. 2005). The moving party "bears a heavy burden as courts generally disfavor motions to strike." (*Id.*) "A court may strike all improper portions of an affidavit or declaration used to support or to oppose a motion for summary judgment, but in resolving a motion to strike a court uses a scalpel, not a butcher knife." *Ascom Hasler Mailing Systems, Inc. v. U.S. Postal Service*, 815 F. Supp. 2d 148, 162-163 (D.D.C. 2011) (internal citations and quotations omitted).

---

[4] In order to succeed on a retaliation claim under Title VII, a plaintiff must show that retaliation was the but-for cause of the adverse employment action at issue. *University of Texas Southwestern Medical Center v. Nassar*, --- S. Ct. ----, No. 12-484, slip op. at 11-12 (June 24, 2013).

III.   NG'S MOTION TO STRIKE

In support of its motion for summary judgment, Defendant submitted three declarations from employees in the Communications Unit: Claudia Bogard, Thomas Novak, and Edward Braese. Ng requests that the Court strike these declarations in full because they were submitted after the close of discovery, and because Ng alleges that the written declarations contradict prior deposition testimony of the declarants. (*See* Plaintiff's Motion to Strike ("Mtn. to Strike") at 1 [ECF No. 25]; Plaintiff's Reply in Support of Motion to Strike ("Pl. Reply") at 1 [ECF No. 30].) Defendant responds that the declarations were correctly and timely filed pursuant to Fed R. Civ. P. 56(c)(4) and 6(c)(2), and that Ng has mischaracterized any purported "inconsistent" testimony.

Ng has failed to carry his burden of establishing that the challenged declarations should be stricken. There is no question that Rule 56 contemplates that a movant may submit supporting materials, including affidavits and declarations, along with a motion for summary judgment. The Rule sets out guidelines for such submissions, stating that they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Ng does not challenge the admissibility of the declarations on any of the grounds described in Rule 56(c)(4), but argues instead that the declarations "violate the Court's Scheduling Order" because they were submitted after the close of discovery. (Mtn. to Strike at 2.) Ng cites no authority for this proposition—nor can he, as the Federal Rules expressly contemplate declarations in support of summary judgment, regardless of when in the discovery process the motion is filed. *See*, *e.g.*, *Johnson v. Shinseki*, 811 F. Supp. 2d 336, 342 (D.D.C. 2011) (denying motion to strike post-discovery declaration in opposition to summary judgment).

Ng also argues (solely in his reply brief) that the declarations should be stricken because they contradict prior deposition testimony of the declarants. Ng is correct that "ordinarily, a party cannot submit a declaration after close of discovery . . . that contradicts its deposition testimony." *Chowdhury v. Hilton Hotels Corp.*, No. 08-cv-2250, 2011 WL 3742721, at *1 (D.D.C. Aug. 25, 2011). However, "the [declaration] must clearly contradict prior sworn testimony, rather than clarify confusing or ambiguous testimony." *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F. Supp. 2d 152, 160-161 (D.D.C. 2008). Here, the Court finds that the allegedly contradictory testimony Ng identifies is not "clearly" contradictory, nor is it contradictory at all.

Ng first argues that Bogard's written declaration suddenly provides reasons for why certain Communications Unit employees did not have their reporting structure changed as a result of the October, 2008, internal reorganization, while during her deposition she testified that she was not aware of such reasons. (Pl. Reply at 2-3.) But closer inspection reveals that Ng has misattributed the relevant deposition testimony: it was Braese, not Bogard, who professed under oath not to remember. (*See* Def. Surreply [ECF No. 33], Ex. 1 at 21:10-16.)

Next, Ng argues that Braese stated in his written declaration that none of Ng's supervisory responsibilities changed after the reorganization, but at his deposition, Braese testified that he had shouldered some of Ng's responsibilities due to the restructuring. (Pl. Reply at 3.) However, even a cursory review of the deposition transcript shows that Braese was making a general reference to his new role as the employee to whom Ng reported, and was not discussing any specific reduction in Ng's level of supervisory responsibility. (*See* Def. Surreply, Ex. 1 at 45:14-19.) Consequently, there is no inconsistency at all—much less a clear

contradiction—between Braese's testimony and his written declaration in regard to Ng's supervisory responsibilities.

Finally, Ng contends that Braese's written declaration contradicted Braese's deposition testimony insofar as the declaration states that certain management training, which Ng had not completed, was "mandatory" before Ng was eligible for the additional investigation training that Ng sought to attend. (Pl. Reply at 3.) Specifically, Ng claims that, when Braese was asked in his deposition how he knew that management training was mandatory, Braese said something that indicated he was unsure of whether the management training was in fact mandatory. (*Id.*) But the full quote from Braese's deposition paints a very different picture:

> Q: And when you say that the management training was mandatory how do you know that? I mean from where do we know that? . . .
>
> A: I'd have to get back with you. I mean I'm not positive what the requirement – I know that it's a management requirement when you assume a management role in the FAA you must complete certain management courses within a specific period of time.

(Def. Surreply, Ex. 1 at 37:7-16.) Because Braese's full deposition testimony makes it clear that he was well aware that management training was mandatory, Ng has once again failed to identify any actual contradiction between the declarants' deposition testimony and the statements in their declarations.

Therefore, for the reasons set forth above, Ng's motion to strike is DENIED.[5]

---

[5] Even if there was merit to the contentions in Ng's motion to strike, it would not affect the ultimate disposition of Defendant's motion for summary judgment, *infra*, as the Court does not rely on any of the purportedly "contradictory" facts raised by Ng in ruling on the motion for summary judgment.

IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons that follow, the Court GRANTS Defendant's Motion for Summary Judgment and dismisses Ng's discrimination case.

### A. Ng Has Failed to Identify Any Adverse Employment Actions

Ng identifies five incidents as the basis for his discrimination claims. As explained below, none qualifies as an "adverse employment action" for the purposes of Title VII.

First, Ng's Complaint contains allegations related to Lavey's recommendation that Ng warranted an SCI-2, rather than SCI-1, rating for 2008. (Compl. ¶ 10-13.) But, as Ng has acknowledged from the filing of his Complaint, Lavey's supervisor *rejected* Lavey's recommendation and instead awarded Ng the *highest* SCI rating for the relevant time period. (Compl. ¶ 13.) The fact that Ng was awarded the highest possible merit bonus cannot be construed as adverse in any sense, and it certainly falls short of meeting the definition of an "adverse employment action" for the purposes of Title VII. Accordingly, Ng has failed to allege adequately that he suffered an adverse employment action with respect to his SCI claim.[6]

Second, Ng argues that the reorganization of his unit, which resulted in his reporting to someone who had previously been his peer, was effectively a demotion and thus an adverse employment action. (Pl. Br. at 15-16.) The gravamen of Ng's complaint with regard to the reorganization is that it "require[d] him to report to someone subordinate to Lavey," whereas he

---

[6] It is also noteworthy that Ng's response to the defendant's summary judgment motion does not address the SCI claim as a basis for his discrimination claims at all, despite the fact that the Defendant argues against Ng's SCI claim at some length (Def. Br. at 7-9). Thus, even if the SCI-related facts that Ng alleges were sufficient to describe an adverse employment action under Title VII, Ng has conceded any discrimination claim based on that action. *See Morris v. Jackson*, 842 F. Supp. 2d 171, 176 n.2 (D.D.C. 2012) ("It is well understood in [the D.C.] Circuit that when a plaintiff files an opposition . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

had previously reported directly to Lavey. (Pl. Br. at 15.) There is no dispute, however, that Ng's salary and benefits remained the same after the reorganization. (D-SOF ¶ 13.) Moreover, Lavey's email of October 21, 2008, which announced the reorganization—and which Ng himself cites as evidence to support his claim—explicitly noted that Ng would "continue to manage the same group he now has." (Pl. Br. Exhibit B.) Prior decisions of this Court clearly establish that an employee's having to report to a former peer as the result of a reorganization does not constitute an adverse employment action for Title VII purposes. *See, e.g.*, *Forkkio v. Tanoue*, 131 F. Supp. 2d 36, 40 (D.D.C. 2001) ("[T]he change in plaintiff's title and reporting relationship due to . . . reorganiz[ation] . . . does not constitute an adverse action. . . Plaintiff's own belief that the reassignment was a 'demotion' and was accompanied by a loss in stature or prestige is insufficient to render it otherwise."); *see also Childers v. Slater*, 44 F. Supp. 2d 8, 21 (D.D.C. 1999) ("Courts have held that reassignment within a division, without demotion or corresponding reduction in salary or benefits does not constitute adverse action."). Ng has adduced no evidence that compels a different conclusion in his case. Thus, there is no genuine issue of disputed fact regarding whether Ng experienced an adverse employment action giving rise to a Title VII claim as a result of the reorganization.

Third, Ng points to the denial of his request to attend investigation training as an adverse employment action. (Pl. Br. at 23-24.) But Ng cites no precedent supporting the argument that the denial of training opportunities to an employee constitutes an adverse employment action. Nor does Ng address the cases Defendant cites, which indicate just the opposite. *See*, *e.g.*, *Casey v. Mabus*, 878 F. Supp. 2d 175, 184 (D.D.C. 2012) ("The mere denial of training opportunities, however, does not constitute an adverse employment action."); *Brooks v. Clinton*, 841 F. Supp. 2d 287, 301 (D.D.C. 2012) (denial of approval to attend a training seminar did not constitute

adverse employment action). Ng merely states conclusorily that denial of the training "prevented Plaintiff from learning about an aspect of his potential job duties." (Pl. Br. at 24.) Even assuming that Ng was qualified to attend the investigation training (which Defendant disputes, Def. Br. at 15), Defendant's refusal to allow Ng to attend a single training seminar does not meet the standard articulated in *Baird* for an adverse employment action. 662 F.3d at 1248.

Fourth, Ng asserts that changes in his role as a manager of the Vortex Project constituted an adverse employment action. Ng summarizes his claims relating to the Vortex Project by alleging that he was "pulled off the project that he spearheaded and for which he was primarily responsible." (Pl. Br. at 25.) But the evidence that Ng has proffered in regard to Vortex does not support this assertion. It is undisputed that Ng had responsibility only for the technical aspects of Vortex, while others had responsibility for the content. (Ng Dep. at 134:9-21; D-SOF ¶ 24.) This being so, Ng vastly overstates his management role and the extent to which the Vortex project was his responsibility. Moreover, Ng's contention that he was "pulled off" the project at approximately "the end of 2008 [or] early 2009" (Pl. Br. at 25) is at odds with Ng's additional claim that he was forced to travel to Washington, D.C. in January 2009 specifically to work on Vortex. (Pl. Br. at 27.) At most, the evidence indicates that Ng's role with respect to Vortex may have been reduced for a limited period of time. (*See* Defendant's Reply Brief in Support of Motion for Summary Judgment ("Def. Reply") at 16.) However, such a limited reduction in work responsibilities does not qualify as an adverse employment action under the *Baird* standard. *See*, *e.g.*, *Peyus v. Lahood*, 11-cv-2087, 2013 WL 358180, at *5 (D.D.C. Jan. 29, 2013) (a temporary reduction in work responsibilities does not constitute an adverse employment action); *Rhone v. U.S. Capitol Police*, 865 F. Supp. 2d 65, 71 (D.D.C. 2012) ("minor losses in job responsibility" do not constitute adverse employment actions).

Finally, Ng alleges that he suffered an adverse employment action by virtue of his sixty-day assignment to work on the Vortex Project in Washington, D.C., in January 2009. (P-SOF ¶¶ 28-32.) Ng argues that this assignment was an adverse employment action for three primary reasons: first, he was required to travel to the District of Columbia on the day after the Presidential Inauguration, which he alleges made it difficult for him to obtain travel and living accommodations (Compl. ¶ 32); second, because upon arrival, Ng found that other employees had been instructed to work from home (Compl. ¶ 33); and third, because there was no work for him to do for the duration of his time in Washington. (Pl. Br. at 27-28.)

The Court is not persuaded that Ng suffered an adverse employment action as a result of his being required to travel to his established duty station around the time of a national holiday to work on a project that he claims was his own. First of all, it is undisputed that Ng spent only a small portion of the 60-day period in Washington. (D-SOF ¶ 31-33.) Moreover, Ng cites no authority for the proposition that an adverse employment action can result from an employer's requirement that an employee work from a particular location. Indeed, the case law points to the opposite conclusion. *See*, *e.g.*, *Bright v. Copps*, 828 F. Supp. 2d 130, 148 -149 (D.D.C. 2011) (employer's requiring employee to attend an in-person meeting was not an adverse employment action); *Beckham v. National R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 149 (D.D.C. 2010) ("Being denied the ability to work from home . . . is a minor annoyance, not an adverse action."). At most, Ng's temporary Washington D.C. assignment was a minor inconvenience—not the "significant change" required to meet the adverse action standard as articulated in *Baird*.[7] Additionally, Ng's assertion that there was little if any work waiting for him upon his arrival

---

[7] Moreover, Ng does not dispute that travel to Washington D.C. was a necessary part of his position. (D-SOF ¶ 3.) To the contrary, Ng himself testified that his job required frequent trips to Washington D.C. (Ng Dep. at 39:19-40:8.)

amounts at most to an allegation that his workload was temporarily reduced. As noted above, such temporary reduction is insufficient to constitute an adverse employment action. *See*, *e.g.*, *Peyus*, 2013 WL 358180, at *5 (temporary reduction in work responsibilities due to suspension was not an adverse employment action). This is particularly true where, as here, the alleged reduction had no effect on Ng's pay or benefits. *Cf. Than v. Radio Free Asia*, 496 F. Supp. 2d 38, 49 (D.D.C. 2007) (noting that a significant reduction in work hours along with reduction in pay may constitute adverse employment action).

      B.  <u>Ng Has Failed to Establish Any Relationship Between His Claims and His Race or National Origin</u>

For the reasons described above, this Court concludes that none of the incidents that form the basis of Ng's Title VII claims qualifies as an adverse employment action. However, even if one or more of the incidents constituted an adverse employment action for Title VII purposes, Defendant would still be entitled to summary judgment because Ng has also failed to show that any of the alleged adverse employment actions occurred *because of* his race, national origin, or as retaliation for his engaging in protected activity. Apart from maintaining that certain of Ng's colleagues mimicked Ng's accent and/or commented that they had a hard time understanding him (Pl. Br. at 20-22), Ng offers no evidence of any discriminatory motivation for any of the alleged adverse actions. And while the accent-related incidents that Ng describes are troubling, Ng makes no attempt to tie them in any way to the completely separate incidents that form the basis of his claims. In sum, assuming that Ng suffered any adverse employment actions, the record is devoid of any evidence connecting the alleged adverse employment actions that Ng identifies to his race or national origin. This failure constitutes a second, independent basis upon which summary judgment must be granted for Defendant. *See*, *e.g.*, *Nagpal v. Holder*, 750 F. Supp. 2d 20, 29 (D.D.C. 2010) (No genuine issue of material fact where plaintiff failed to show

any connection between comments about his national origin and adverse employment actions); *Sewell v. Chao*, 532 F. Supp. 2d 126, 139 n.8 (D.D.C. 2008) (stray remarks in the workplace unrelated to challenged employment decisions were insufficient to create a triable issue of discrimination).

V.     CONCLUSION

For the reasons set forth above, the Court hereby DENIES Ng's motion to strike certain declarations related to the defendant's summary judgment motion; and GRANTS Defendant's motion for summary judgment.

SO ORDERED.

Date:   July 5, 2013

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge